# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

STAGING DIMENSIONS, INC., )
)
      Plaintiff, )
)
      v. )    Case No.: CPU4-19-001377
)
KP WALSH ASSOCIATES, INC., )
)
      Defendant. )

Submitted:    January 24, 2020
Decided:     March 19, 2020

Scott B. Czerwonka, Esquire
4250 Lancaster Ave., Suite 200
Wilmington, DE 19806
*Attorney for Plaintiff*

R. Karl Hill, Esquire
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
*Attorney for Defendant*

## DECISION AFTER TRIAL

The plaintiff, Staging Dimensions, Inc., (hereinafter "Plaintiff"), filed a breach of contract action against the defendant, KP Walsh Associates, Inc., (hereinafter "Defendant"), alleging Defendant breached the contract and warranties associated with the purchase of a large piece of industrial equipment. Plaintiff is in the business of providing permanent and portable stages for different events and venues. Plaintiff contracted with Defendant – a full-service machinery distributor selling new and used wood working machinery – for the purchase of an industrial router. As late as May 2018, Plaintiff contacted Defendant to purchase a used Andi Stratos WFD 4x8 CNC Router (hereinafter "Andi Router") for $26,500.00.

On September 4, 2018, the Andi Router arrived at Plaintiff's business. Plaintiff discovered the Andi Router was damaged in transit and immediately contacted Defendant. Defendant, sent Peter McKee (hereinafter "McKee") out to inspect and repair the Andi Router. McKee worked approximately forty hours to diagnose and repair the Andi Router, at no cost to Plaintiff. McKee purchased the Andi Router replacement parts and repaired the Andi Router. Ultimately, Plaintiff argues the machine never operated as agreed upon.

In November of 2018, Plaintiff and Defendant discussed the purchase of an additional router, specifically a used CR Onsrud 97M12 4x8 "Mate Series" CNC Router 2013 (hereinafter "Onsrud Router"). After the parties reached an agreement on a $50,000.00 purchase price with a $25,000 credit, Plaintiff never purchased the Onsrud Router.

On April 4, 2019, Plaintiff filed the instant lawsuit against Defendant. Plaintiff seeks recovery of $26,500.00, plus pre- and post-judgment interest, costs for removal or disposal of the Andi Router, costs for storing the Andi Router and attorney's fees. Defendant counterclaims seeking $3,400.00 in shipping costs for the Andi Router.

## FACTS AND PROCEDURAL HISTORY

At trial, the rendering of events conflicted between the parties, and at times, within a given party's own account. Based on the testimony and evidence presented at trial, the Court finds that following facts:[1]

Plaintiff's Vice President, Kimberly Moore ("Moore"), was introduced to Defendant in May of 2018. Plaintiff needed a larger router that could operate in three dimensions and understood Defendant's business sold industrial wood cutting equipment. On May 23, 2018, Defendant provided Plaintiff a quote on the Andi Router. Defendant's Andi Router quote shows

---

[1] Throughout this opinion the Court references various email exchanges. The emails will be quoted verbatim without edits, to the extent practical.

2

"installation is an additional cost."[2] On June 15, 2018, Defendant sent Plaintiff a document entitled "quotation summation" including the purchase price for the Andi Router, dust collector and additional prices for shipping and installation.[3]

On June 18, 2018, Defendant contacted Plaintiff to finalize the parties shipping agreement. Before finalizing the shipping arrangements, Plaintiff inquired about the location of the Andi Router.[4] After conducting independent research on shipping the Andi Router, Plaintiff decided to approve Defendant's shipping arrangements. On June 26, 2018, Defendant told Plaintiff that they could "deal with freight and install separately."[5] On June 26, 2018, Defendant emailed Plaintiff with an invoice numbered 2464.[6] Defendant's invoice 2464 details the two machines Plaintiff purchased and the purchase price for each machine.[7] The invoice indicates payment was made by credit card and shipping was "F.O.B. CA to PA" (emphasis in original). [8] On the same day, Plaintiff asked Defendant whether the "router come with a manual and/or warranty."[9] Defendant responded to Plaintiff's inquiry stating

I am thinking manuals with it. I can get easily if something missing. Cover all for

30 days. Depending on problem will review first 90.[10]

On September 4, 2018, Plaintiff received the Andi Router. Upon arrival, Moore immediately emailed Walsh that,

---

[2] Joint Ex. No. 5.

[3] Joint Ex. No. 6.

[4] At trial, Moore indicated Plaintiff was looking into various shipment methods and cost.

[5] Joint Ex. No. 19. At trial, Moore denied this language indicated shipping would be an additional costs and Plaintiff's responsibility.

[6] Invoice 2464 is marked "PAID 06/27/2018" (emphasis in original).

[7] Invoice 2464 includes the Andi Router for 25,000.00 dollars and the vacuum pump for 1,500.00 dollars.

[8] Joint Ex. No. 16.

[9] Joint Ex. No. 18.

[10] Joint Ex. 18. Neither the May 23, 2018, Andi Router quote, June 15, 2018, quotation summation, or June 26, 2018, 2464 invoice mention product warranties; see also Tr. 215: 3-10, 235: 15-18 (Walsh explains that warranty language was meant to provide parts and labor to make the Andi Router Operational).

[t]he router was delivered . . . and has incurred damage in transit. Please let me know if there is anything else you need to get this claim started.[11]

Two weeks later on September 14, 2018, Moore received photographs of the damaged Andi Router from Plaintiff's Shop Manager, Justin Phillips (hereinafter "Phillips"). Moore sent the photographs, evidencing the damaged Andi Router, to Walsh including a list of damages and asks Walsh "what the next step is to being reimbursed for these damages."[12] In an email to Walsh, Moore explains the photographs and damages to the Andi Router as follows:

> Pic 1 & 2: Are showing the frame for the shield has a crack in the corner. Looks to be from when vacuum for the table slid into the door. bending it and cracking from along with breaking plexi/Lexan.
> Pic 3: With the Z sticker, the whole shielding is bent. Looking to be from strapping down.
> Pic 4: The foot pedal guard is shattered.
> Pic 5: The cable tray is broken in 2 places. It's supposed to link back to bridge so it doesn't drag.[13]

On September 17, 2018, Walsh's response to Moore's email states that he would "connect [with Plaintiff] . . . to advise when tech will be there to review."[14] On September 26, 2018, Plaintiff contacted Defendant and asks "are you buying the parts and repairing or are we doing it and sending over the invoice."[15] That same day, Moore contacts Phillips to get an update on the status of the Andi Router repairs. In response to Moore's inquiry about the Andi Router repairs, Phillips explains that,

> [y]es [McKee] got a list of stuff to buy that needs to be fix. My understanding is hes getting the parts and fixing it. So while he was getting parts and so forth i need to get it powered up. I got with Brandon about getting power to it. Last we spoke he was to get me a list of wire etc to buy . . . .[16]

[11] Joint Ex. 20.
[12] *Id.*
[13] Joint Ex. No. 21.
[14] Joint Ex. No. 25.
[15] Joint Ex. 23.
[16] Joint Ex No. 25.

4

On October 8, 2018, Walsh's update explains when the Andi Router parts were due to arrive and when McKee planned to conduct repairs. It is undisputed Mckee spent approximately 40-50 hours working on the Andi Router in Plaintiff's shop. At trial, Plaintiff admitted that Defendant was working on the Andi Router until late October.[17] The repairs were completed, and McKee's last day on site at Plaintiff's place of business was October 30, 2018.[18]

On November 6, 2018, Plaintiff filed its first credit card claim with American Express disputing the purchase of the Andi Router. On November 14, 2018, Walsh emailed Moore apologizing and extending an offer for the purchase of an alternative router, specifically the Onsrud Router.[19] On December 5, 2018, Moore's response to Walsh's November 14th email states "Scott [Humphrey] would like to remove the old machine from our floor and we would also like you to email specs and pricing on machines you currently have available."[20] On December 6, 2018, Walsh's response to Moore's email states,

> I feel that the best solution for staging is for me to sell you the almost new Onsrud 97m and take back andi sold[.] I will lower previous prices and including the vacuum pimp, (sic) delivery of new machine and pick up of andi and install for a difference of 30[,]500.00 with a 3 month warranty[.] We can do this right away . . . .[21]

On December 10, 2018, Moore asks Walsh to adjust the proposal by removing the vacuum pump.[22] Defendant's invoice for the Onsrud Router includes a $25,000.00 credit, delivery, installation and "Used ANDI machine picked up" (emphasis in original) for a total purchase price of $50,000.00.[23]

---

[17] Join Ex. No. 57; *see also* The parties stipulated facts in Plaintiff's post-trial opening brief.
[18] *Id.*
[19] Joint Ex. 29. The parties were in conversation about the Onsrud Router as early as May of 2018.
[20] Joint Ex. 30.
[21] Joint Ex No. 32.
[22] Joint Ex No. 35.
[23] Joint Ex. No. 33.

On December 10, 2018, Defendant creates an invoice numbered 2558 for the purchase of the Onsrud Router.[24]

On December 11, 2018, Walsh asks if Plaintiff had "everything [it] need[ed] and we are good to go?"[25] In response, Moore states, "[y]es, we are good to go[.]" (in an email relating to the purchase of the Onsrud Router). We will make a 25% deposit and will pay balance in full once machine is installed and operating on our floor."[26] Walsh asks whether Plaintiff "released cc claim" stating "that needs done right away[.] I can agree to 50% or 12500.00 with balance on complete install asap[.]"[27]

On December 12, 2018, Walsh contacted Moore regarding the status of the Onsrud Router purchase. Moore states "we are working on getting your 25% deposit over."[28] On December 13, 2018, Walsh emails Moore once again asking about the status of the Onsrud Router and whether Plaintiff released its credit card claim. On December 14, 2018, Moore indicated Plaintiff's "looking into purchasing a brand new router since the cost is not much more than [Defendant's] offer on the used router."[29] In the same email, Moore instructs Walsh to refrain from contacting the Owner of Staging Dimensions (hereinafter "Humphrey").[30]

On December 17, 2018, Defendant received a letter from Plaintiff's attorney. On December 19, 2018, Humphrey received notice that American Express could not issue a credit on Plaintiff's credit card dispute. On January 3, 2019, Plaintiff filed a second American Express credit card dispute on the purchase of the Andi Router.

---

[24] Joint Ex. No. 34.
[25] Joint Ex. No. 38
[26] *Id.*
[27] Joint Ex. No. 41
[28] Joint Ex. No. 42.
[29] Joint Ex. No. 43.
[30] *Id.*

On January 3, 2019, Phillip created a document entitled "Andi Stratos Router"[31] and detailed further down the page, "[i]ssues with router the day it arrived to now."[32] Towards the end of Phillip's document, he explains

> "[t]he [Andi Router] at this point is working but not able to run product on. The tool changer is in still need of a part or 2 to run product. We still need to get tooling for the machine because all of the tooling that did come with it is burnt up or damaged around collets." [33]

On January 14, 2019, McKee sent Walsh a document detailing what issues were diagnosed on the Andi Router and what he repaired or replaced. The document reads as follows:

Staging Dimensions Anderson Stratos WFD sn 0-88016

Things to be addressed
No parts manual – received the CD
X axis Cable track mounting bracket is broken – repaired – bought new parts
Safety hood: 1- plexiglass is broken
2 ea. Plexiglass 23x21.5
2- Hood frame in cracked
3- Mounting Frame in bent
4- gas cylinders are not Working.
Items 1 2 & 3 were caused by the vacuum pump shifting during shipping and crashing into the hood
Tool changer seams to be disabled need proximity switch LS73 and 2 flow control valves – repaired
2 of the Grease line are broken on the spindle up/ down carriage –repaired
Rust pits on Y axis linear rail – cleaned up rails
Brush raise guides are missing the bearings bought new bearings and rod – repaired
Several air lines have patches in the cable track – repaired
Rexroth bearing 1622-213-10 Andi part # 40908102 – 2 ea. For Y
Cycle start switches and lights need to be replaced – done
Spindle tool change cylinder locked up – replaced
Had to replace Spindle VFD because it got fried from over voltage due to wired being incorrectly labeled[34]

---

[31] Joint Ex. No. 2.
[32] *Id.*
[33] *Id.*
[34] Joint Ex. No. 57. This document also includes McKee's work hour log which totals to 58 hours.

On January 22, 2019, Defendant's attorney sent a letter to Plaintiff's attorney. On January 29, 2019, Defendant's attorney requested an opportunity to inspect the Andi Router. Plaintiff did not respond to Defendant's request. Defendant did not inspect the Andi Router before the instant lawsuit was filed. On March 7, 2019, Humphrey received a letter from American Express explaining it could not issue a credit on Plaintiff's second credit card dispute.

On April 4, 2019, Plaintiff filed the instant lawsuit against Defendant. On September 17, 2019, just prior to trial, an inspection of the Andi Router took place. Trial in this matter took place on September 26, 2019. After trial, this Court reserved the matter for decision and instructed the parties to submit supplemental briefing to the Court. Briefing was complete on January 24, 2020. This is a final decision and order of the Court following post-trial briefing.

## PARTIES' CONTENTIONS

Plaintiff alleges the Andi Router was never operational. Plaintiff contends Defendant has breached its express warranty, implied warranty of merchantability and implied warranty of fitness for a particular purpose under the parties' contract. Plaintiff alleges damages in the amount of $26,500.00.[35] Plaintiff also seeks costs associated with the removal of the Andi Router, storing the Andi Router and attorney's fees in this matter. Plaintiff alleges Defendant, did not repair the Andi Router to operate at its intended purpose. Plaintiff asserts Defendant never invoiced Plaintiff for the shipping costs associated with the Andi Router.

Defendant claims Plaintiff is in breach of contract. Defendant claims Plaintiff is responsible for the shipping costs associated with delivering the Andi Router. Defendant further claims the Andi Router was working after it was repaired by McKee. Defendant contends it is not in breach of any express or implied warranty related to the purchase of the Andi Router.

---

[35] $26,500.00 includes the $1,500.00 purchase price for the vacuum pump.

8

## LEGAL STANDARD

As trier of fact, the Court is to assess the credibility of the witnesses and, where there is a conflict in the testimony, to reconcile these conflicts, "if reasonably possible[,] so as to make one harmonious story."[36] In doing so, the Court takes into consideration the demeanor of the witnesses, their apparent fairness in giving their testimony, their opportunities in hearing and knowing the facts about which they testified, and any bias or interest they may have concerning the nature of the case.[37] In civil cases, "a plaintiff has the burden of proving the elements of their case by a preponderance of the evidence.[38] Proof by a preponderance of the evidence means proof that something is more likely than not."[39] Therefore, "the side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[40]

## DISCUSSION

After trial the Court must determine whether Defendant breached its express or implied warranties to Plaintiff and whether Plaintiff breached its contract with Defendant.

### A. Express Warranty:

The statutory basis for a claim for damages based on breach of an express warranty arising out of a sale of goods under Delaware law is found in Delaware's counterpart to the Uniform Commercial Code ("UCC").[41] UCC section 2-313(1) provides that express warranties of a seller of goods are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes a basis of the bargain creates an express warranty that the good shall conform to the affirmation or promise.

---

[36] *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr., et. al.*, 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000).
[37] *See State v. Westfall*, 2008 WL 2855030, at *3 (Del. Com. Pl. Apr. 22, 2008).
[38] *Narayan v. Sutherland Global Holdings Inc.*, 2016 WL 3682617, at *8 (Del. Ch. Jul. 5, 2016) (internal citations omitted).
[39] *Id.*
[40] *Trumbo v. LST Investments*, 2015 WL 8200712, at *3 (Del. Com. Pl. Dec. 7, 2015) (internal citations omitted).
[41] *Bell Sports, Inc. v Yarusso*, 759 A.2d 582, 592 (Del 2000).

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.[42]

According to UCC section 2-313(2), "it is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee,'" to form an express warranty.

An express warranty becomes a basis of the bargain[43] and provides a buyer with security in their investment. To satisfy a breach of warranty claim, "[t]he buyer must prove: (1) the existence of an express . . . warranty, (2) a breach of the defendant's express . . . warranty, (3) a causal connection between the defendant's breach and the plaintiff's injury or damage; and (4) the extent of loss proximately caused by the defendant's breach."[44] "Also, 'the buyer must first prove compliance with any conditions precedent that the seller has imposed with respect to the warranty.'"[45]

First, Plaintiff must show that a warranty exists. At trial, Defendant conceded the Andi Router had a warranty.[46] Defendant communicated to Plaintiff that Defendant would "[c]over all for 30 days[.] Depending on the problem, will review first 90."[47] At trial, Defendant explained that this language was intended to provide Plaintiff with a parts and labor warranty for the Andi Router.[48] Nevertheless, a warranty was provided, however ambiguous it may have been as to the scope of coverage.

---

[42] 6 *Del. C.* § 2-313.

[43] *Emmons v. Tri Supply & Equip. Inc.*, 2013 WL 4829272, at *5 (Del. Super. 2013).

[44] *Driscoll v. Automaxx*, 2016 WL 5107066, at *2 (Del. Com. Pl. 2016).

[45] *Id.*

[46] In Defendant's Answer to Plaintiff's first set of interrogators, Defendant explained the 30 day warranty language as a commitment to provide parts and service to make the Andi Router operational, not as a warranty that the Andi Router could be returned.

[47] Joint Ex No. 18.

[48] Defendant states the express warranty was meant to be a parts and labor warranty in answering Plaintiff's interrogatories.

Second, Plaintiff must prove that Defendant was in breach of its express warranty. Plaintiff asserts that the "cover all" language in Defendant's express warranty indicated to Plaintiff that Defendant would cover everything for thirty days.[49] Plaintiff even takes it as far to indicate that "cover all" meant that Plaintiff could return the Andi Router for any reason.[50] Plaintiff's position on this point is absurd. Defendant's warranty was ambiguous, however Plaintiff, knew Defendant's express warranty was limited to parts and repairs. Defendant demonstrates that Plaintiff knew the warranty was limited to parts and repairs when inquiring about the Andi Router repairs by email on September 26, 2019. Plaintiff's email asks Defendant whether it was "buying the parts and repairing or [is Plaintiff] doing it and sending over the invoice."[51] Plaintiff understood that Defendant's express warranty was for parts and repairs to get the Andi Router working. In addition, Moore's trial testimony indicates Plaintiff understood Defendant's warranty to be for parts and repairs. At trial, Moore explained Defendant's express warranty as "cover all, repairs, anything necessary to make the machine operational" as Plaintiff's understanding of Defendant's express warranty.[52] In addition, Plaintiff's actions indicate that it did not believe it had an all-encompassing blanket express warranty, which would allow it to return the purchased equipment for any reason – or no reason at all.

Therefore, the question for the Court boils down to whether Defendant breached its express warranty by failing to repair the Andi Router. It is undisputed that the Andi Router sustained damage in transit. There is also no dispute that McKee spent a substantial amount of time at Plaintiff's facility repairing the Andi Router- a point belabored at trial.[53] Defendant bought $3,500

---

[49] Joint Ex. No. 18.
[50] *Id.*
[51] Joint Ex. No. 23.
[52] Moore Tr. 19: 17-18.
[53] At trial, Defendant made it very clear McKee spent a large amount of time repairing the Andi Router.

to $4,500 worth of parts to repair the Andi Router at no cost to Plaintiff. In addition, Phillip indicated that the Andi Router was "working, but not able to run product on," following McKee's repairs to the Andi Router.[54] McKee indicated at trial that he had the Andi Router spinning and operating in all required directions as of October 30, 2018. Moreover, it was Plaintiff's responsibility to purchase a tool holder, tool changer and program to run the Andi Router and it is undisputed that Plaintiff never purchased the required items to run product on the Andi Router.[55] Accordingly, Defendant did not breach its express warranty to Plaintiff because McKee repaired the Andi Router when Plaintiff exercised its 30 day express warranty.

## B. Revocation:

Plaintiff argues that it timely revoked acceptance of the Andi Router. Under the UCC, revocation of acceptance requires a showing that any non-conformity has not been "seasonably cured" and notice within a "reasonable time."[56] Plaintiff indicated that in its October 18, 2018, document that it "did not want the machine anymore." As pointed out by Defendant, there is no trial testimony to support Plaintiff's statement as a revocation of acceptance. In the same October 18, 2018, document where Plaintiff allegedly is revoking its acceptance of the Andi Router, Plaintiff is also asking for more information on an alternative router. Plaintiff did not provide any further evidence that as of October 18, 2018, Plaintiff revoked its acceptance of the Andi Router. Moreover, Plaintiff continued to permit Defendant to make necessary repairs to the Andi Router, undermining its claim of revocation.

Plaintiff then indicates its attempt to revoke acceptance of the Andi Router in two December 2018 correspondence with Plaintiff. In Plaintiff's email to Defendant on December 5,

---

[54] Joint Ex. No. 2.
[55] Phillip testified it was Plaintiff's responsibility to replace the tool changer. Plaintiff's only explanation for not purchasing the necessary parts and program to run the Andi Router was because Plaintiff was too busy.
[56] 6 *Del. C.* § 2-608.

12

2018, there is no indication that the Andi Router was not working or that Plaintiff was revoking its acceptance of the Andi Router.[57]

As of December of 2018, the parties were negotiating a deal for the Onsrud Router. On December 11, 2018, Plaintiff indicated to Defendant that it was "good to go" referring to the purchase of the Onsrud Router.[58] Defendant indicated that it thought the parties had reached a deal on the Onsrud Router and Defendant created an invoice for the purchase of the Onsrud Router. On December 14, 2018, Plaintiff changed course and informed Defendant it was "looking to purchase a brand new router."[59] Three days later Plaintiff's lawyer mailed a letter to Defendant requesting the removal of the Andi Router. These December notices cannot form the basis of the Plaintiff's revocation as by this time the Andi Router had been repaired. In addition, Defendant started to cure the Andi Router's damages within Defendant's express "[c]over all for 30 days" parts and repairs warranty.[60] Therefore, Plaintiff did not effectively and unequivocally revoke its acceptance and the Defendant seasonably cured the damages sustained to the Andi Router.

## C. Implied Warranty of Merchantability:

Under UCC section 2-314 (1), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respects to goods of that kind."[61] In order to be liable for breach of an implied warranty of merchantability, the party must be found to be a merchant within the meaning of UCC section 2-314.[62] The term merchant is defined in UCC section 2-104 as:

[a] person who deals in good of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved

---

[57] Plaintiff suggests that its second December revocation was indicated in its attorney's December letter.
[58] Joint Ex. No. 41.
[59] Joint Ex. No. 43.
[60] Joint Ex. No. 18.
[61] 6 *Del. C.* § 2-314.
[62] *Id.*

in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.[63]

In order to prevail on a claim for breach of warranty of merchantability, a Plaintiff must prove (1) that a merchant sold goods; (2) which were defective at the time of sale; (3) causing injury to the ultimate consumer; (4) the proximate cause of which were the defective nature of the goods and (5) the seller received notice of the injury.[64] Under UCC section 2-314(2),

Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and
(b) In the case of fungible goods, are of fair average quality within the description; and
(c) Are fit for the ordinary purpose for which such goods are used; and
(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) Are adequately contained, packaged, and labeled as the agreement may require; and
(f) Conform to the promises or affirmations of fact made on the container or label if any.[65]

There is no dispute Defendant is a merchant under the UCC. Also, Plaintiff, did document and notify Defendant about the Andi Router damages.

Plaintiff must show that the Andi Router was not merchantable at the time of sale. In other words, the Andi Router "must have been capable of passing without objection in the trade under the contract description, and be fit for the ordinary purpose for which it was intended."[66] In this case, Plaintiff has failed to prove that the Andi Router was defective at the time of sale. Defendant provided photographs of the Andi Router to the Plaintiff prior to sale. Plaintiff was fully aware

---

[63] *Id.*
[64] Reybold Grp., Inc. v. Chemprobe Techs., Inc., 721 A.2d 1267, 1269 (Del. 1998); see also Strobert Tree Services, Inc. v. Kenneth Lilly Fasteners, Inc., WL 1500606 (2019).
[65] 6 *Del. C.* § 2-314.
[66] *Neils Business Equipment Center, Inc. v. Italo V. Monteleone, M.D., P.A.,* 524 A.2d 1172 (Del. 1987).

14

the Andi Router is a used machine.[67] Plaintiff did not have any objections to the condition of the Andi Router. It is undisputed the Andi Router sustained damages in transit after the time of sale. Therefore Plaintiff, does not satisfy the second element required for a claim of implied warranty of merchantability. The Court concludes Defendant did not breach its implied warranty of merchantability to Plaintiff.

**D. Implied Warranty of Fitness for a Particular Purpose:**

Pursuant to UCC section 2-315,

"[w]here the seller . . . has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is a . . . implied warranty that the goods shall be fit for such purpose."

The implied warranty for a particular purpose is narrower than the implied warranty of merchantability. The implied warranty for a particular purpose is a "gap-filler" provision of the UCC which is implied in every sale of goods unless explicitly disclaimed.[68] To be successful under a claim for warranty of fitness for a particular purpose one must claim: (1) a buyer has a special purpose for certain good; (2) the seller knew or had reason to know of that purpose; (3) the seller knew or has reason to know that the buyer was relying on the seller's superior skill to select goods that fulfilled that purpose; and (4) the buyer in fact relied on the seller's superior skill.[69]

In this case, Defendant knew Plaintiff intended to use the Andi Router to cut product in connection with constructing stages for its custom staging business. There is no evidence to support the conclusion that the Andi Router was not suitable for 3D printing at the time of purchase. In addition, Plaintiff's employee, Phillips indicated that the Andi Router was working

---

[67] At trial, Moore understood the Andi Router was a used machine but that it was functioning and capable of the work Plaintiff needed accomplished.

[68] There is no dispute that Defendant did not disclaim any implied warranties.

[69] 6 *Del. C.* § 2-315; see also *Dilenno v. Libbey Glass Div., Owens-Illinois Inc.*, 668 F. Supp. 373 (1987).

after McKee conducted repairs. The Andi Router, although a used machine, is designed to cut 3D product in the manner in which Plaintiff intended. Therefore, Defendant did not breach its implied warranty of fitness for a particular purpose to the Plaintiff.

## E. Breach of Contract: Shipping Cost

It is undisputed Plaintiff and Defendant entered into a contract for the Andi Router. Under the UCC section 2-204, "[a] contract for the sale of good may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[70] In addition, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."[71] Under UCC section 2-207,

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it stats terms additional or difference from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.[72]

Under the UCC, additional terms, between merchants will become part of the contract unless; "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already or is given within a reasonable time after notice of them is received."[73] In addition, the UCC covers conduct between parties that forms a contract. Under UCC section 2-207(3), "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."[74]

---

[70] 6 *Del. C.* § 2-204(1).
[71] *Id.* at 2-204(3).
[72] 6 *Del. C.* § 2-207(1).
[73] 6 *Del. C.* § 2-207(2).
[74] *Id.* at 2-207(3).

Contracts between merchants are enforceable, "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies . . ." the requirements under the UCC's version of the statute of frauds ". . . against such party unless written notice of the objection to its contents is given within ten days after it is received."[75] A breach of contract "occurs by a party's non-performance, repudiation, or both."[76] Additionally, the breach must be "material."[77] The breach will be deemed material if it concerns the "'root' or 'essence' of the agreement between the parties, or [is] 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'"[78]

Under UCC section 2-319 (1)(a), "when the term is F.O.B the place of shipment, the seller must at that place ship the goods . . . and bear the expense and risk of putting them into possession of the carrier."[79] In this case, Defendant provided Plaintiff with quotes for the Andi Router's shipping costs. The Plaintiff looked into alternative methods of having the Andi Router shipped to Plaintiff's shop but ultimately decided to use Defendant's carrier for shipment. Defendant arranged with a carrier to have the Andi Router delivered to Plaintiff's place of business. There is no dispute Defendant paid to ship the Andi Router from California to Delaware. In addition, the Andi Router arrived at Plaintiff's business.

In this case, On June 15, 2018, Defendant sent Plaintiff a document entitled "Quotation Summation."[80] Defendant's document lists the shipping costs associated with the Andi Router.

---

[75] 6 *Del. C.* § 2-201(2).

[76] *Preferred Financial Services, Inc. v. Business Builders for Entrepreneurs, LLC,* 2016 WL 4537759, at *3 (Del. Com. Pl. Aug. 30, 2016) (internal citations omitted).

[77] *See id.*

[78] *2009 Caiola Family Trust v. PWA, LLC,* 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015) (internal citations omitted).

[79] 6 *Del. C.* § 2-319.

[80] Joint Ex. No. 7.

On June 26, 2018, Defendant indicated that the parties "can deal with freight and install separate."[81] Following this email conversation, Plaintiff provided Defendant with the credit card information issued for payment of the Andi Router.

Defendant informed Plaintiff in writing that the shipping costs for the Andi Router would be handled separately. Plaintiff also indicated at trial, through Moore's testimony, that Plaintiff agreed to and was generally responsible for the shipping costs associated with the Andi Router.[82] Defendant delivered the Andi Router to the carrier and the carrier delivered the Andi Router to Plaintiff's business. Defendant relied on its contract for shipping costs related to the delivery of the Andi Router. Plaintiff is in breach of contract for the shipping cost of the Andi Router because Plaintiff has not yet paid Defendant for the shipping costs. Therefore, defendant is entitled to the shipping cost associated with the delivery of the Andi Router.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** this 19th day of March 2020, that judgment be entered in Defendant's favor against Plaintiff. Judgment is also entered in favor of Defendant on Defendant's counterclaim in the amount of $3,400.00, plus costs, pre- and post-judgment interest at the legal rate and attorney's fees.

The Honorable Carl C. Danberg
Judge

cc:     Patricia Thomas, Judicial Case Manager

---

[81] Joint Ex. No. 18.
[82] At trial, Moore's reluctance to concede Plaintiff's responsibility for shipping costs was a factor in the Court's determination on credibility.

18